82 F.3d 1020
 29 UCC Rep.Serv.2d 905
 BUFMAN ORGANIZATION, a Florida corporation, Zev Bufman,
Vilma Bufman, individually and as guarantor, Zev Bufman
Sports Entertainment & Facility Development Corporation,
Plaintiffs-Counter-Defendants-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate
capacity and as Receiver, Bank M, a commercial bank
chartered pursuant to the laws of the State of Florida,
Defendants-Counter-Claimants-Appellees.
 No. 93-5137.
 United States Court of Appeals,
Eleventh Circuit.
 May 13, 1996.
 
 Leonard H. Bloom, Mark R. Dern, Nortman & Bloom, P.A., Miami, FL, Martin D. Minsker, David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for appellants.
 Patricia Halvorson Thompson, Popham, Haik, Schnobrich & Kaufman, Ltd., Miami, FL, for Bank M.
 J. Scott Watson, Washington, D.C., for appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before COX, Circuit Judge, DYER, Senior Circuit Judge, and GOETTEL*, Senior District Judge.
 PER CURIAM:
 
 
 1
 Zev Bufman and others appeal following a grant of summary judgment for the Federal Deposit Insurance Corporation ("FDIC") as Receiver on Bufman's claims for relief, and a grant of summary judgment for the FDIC in its corporate capacity on the FDIC's counterclaim on a note. This appeal involves the question of whether Bufman's claims and defenses are barred by the D'Oench doctrine or its statutory counterpart. We hold that Bufman's claim for the failed bank's failure to give notice of dishonor is not barred. We also hold that summary judgment on Bufman's civil theft claim was error, and remand these two claims to the district court. We affirm the district court with respect to the remainder of Bufman's claims and his defense.
 
 I. BACKGROUND
 
 2
 In June of 1986, the Bufman Organization obtained a $750,000 line of credit from Bank M, a federally-insured bank operating in Miami, Florida. The loan was evidenced by a promissory note ("the Bufman note"), which was personally guaranteed by Zev and Vilma Bufman and secured by the assignment of an insurance policy on the life of Zev Bufman.[1] Zev Bufman used the line of credit to finance his business activities, which included civic amphitheater management and live theater production. Almost three years later, in February 1989, the remaining principal due on the note was around $400,000.
 
 
 3
 In late 1988, Bank M began soliciting subscriptions for a private offering of stock in an effort to increase the bank's capital to a level that would satisfy an agreement with state and federal regulators. Raul Masvidal, a principal shareholder in Bank M and an advisor to the board of directors, assisted Bank M in its efforts to raise capital. Masvidal and a group of investors wanted to purchase Bank M stock, but were awaiting financing from another Miami bank.
 
 
 4
 On February 14, 1989, Zev Bufman signed an agreement to loan Masvidal $400,000 "to facilitate the purchase of ... common stock of Bank M." (R. 1-1, Masvidal loan agreement at 1.) Masvidal executed a note ("Masvidal note") promising to pay the loan principal plus twelve per cent interest on March 1, 1989, two weeks after the execution of the note and loan agreement. When the agreement and note were executed, Masvidal gave Zev Bufman one check for the $400,000 principal and another check for $1,972.65 in interest. The checks were post-dated March 1, and were drawn on Masvidal's personal account at Bank M. In late February, Masvidal asked Zev Bufman to extend the time for repayment of the Masvidal loan by one week, and Zev Bufman agreed. Masvidal provided Zev Bufman with a third check, dated March 7, 1989, for the additional interest.
 
 
 5
 The events of March 7, 1989, while important to the resolution of some of the issues in this case, are not entirely clear from the record. The magistrate judge, whose report and recommendation was adopted by the district court, found that on March 7, Zev Bufman endorsed the three checks from Masvidal and "sent them to Bank M for deposit." (R. 3-120 at 3.) The magistrate judge also found that the deposit was accompanied by a transmittal letter instructing the bank to deposit the checks in Bufman's account at Bank M, and to charge Bufman's account for the remaining balance on the Bufman note. Zev Bufman testified at his deposition that on March 7, he instructed someone in his office to give the checks and transmittal letter to Masvidal's driver, who would deliver them to Bank M. Jennifer Sardina, Masvidal's administrative assistant, testified that she telephoned Bank M on March 7 and spoke to a "female on the platform" who told her that Bufman's checks had arrived. Sardina defined the "platform" as the lobby of the bank, and agreed with the statement that this was the site to which checks for deposit would generally be delivered.
 
 
 6
 The district court found that the three checks were not deposited but were returned to Masvidal, who had an office at Bank M. The court made no finding as to whether the checks were properly presented to Bank M under Florida law. See Fla.Stat.Ann. § 673.5011 (1993) (defining presentment). The checks were not paid by the bank, and Bufman claims that the bank did not return the unpaid checks to him or give him notice of dishonor. Bufman claims that he did not know that the checks were unpaid until he learned in April of 1989 that Bank M regarded the Bufman note as unsatisfied.
 
 
 7
 Masvidal deposited the $400,000 that he borrowed from Zev Bufman into an escrow account with Bank M to reserve subscriptions for Bank M stock for himself and other investors. On March 24, 1989, Bank M broke escrow on the account, and the money that Zev Bufman loaned Masvidal was used to purchase Bank M stock. Masvidal had been unable to find other financing for the stock purchase before the closing. In March 1989, Zev Bufman also purchased $80,000 of Bank M stock following the private offering. Bufman claims that at the time of the closing, he did not know that the three checks had been dishonored or that Bank M regarded his obligation on the Bufman note as unsatisfied. Masvidal has not repaid the loan from Zev Bufman, and Bufman has not paid the $400,000 principal balance on his note to Bank M.
 
 
 8
 In February of 1990, Bufman filed suit against Bank M in Florida state court, making claims of (1) state law securities fraud, (2) failure to give notice of dishonor, (3) breach of duty, (4) unjust enrichment, and (5) civil theft. By June of the same year, state and federal regulators had declared Bank M insolvent. The Federal Deposit Insurance Corporation was appointed receiver for the bank ("FDIC/Receiver"), and purchased the Bufman note in its corporate capacity ("FDIC/Corporate"). The FDIC in both capacities was substituted for Bank M in Bufman's suit. Bufman amended his complaint to request monetary relief against the FDIC/Receiver; he sought declaratory relief against the FDIC/Corporate, seeking a declaration that he had no liability on the Bufman note. The FDIC removed the action to federal court. The FDIC/Corporate counterclaimed to collect the Bufman note and to foreclose on its security interest, the life insurance policy on Zev Bufman.
 
 
 9
 On the FDIC's motion for summary judgment, the district court accepted the report and recommendation of a magistrate judge that the motion be granted. The magistrate judge found that all of Bufman's claims were related to his contention that the Bufman loan had in fact been paid. The magistrate judge concluded that, because there was no evidence in the bank's records of payment or unsatisfied conditions to repayment, Bufman's claims were barred by D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e)(1) (1994). The district court entered judgment against Bufman on the note for $400,000 and interest. Bufman appeals.
 
 II. ISSUE ON APPEAL AND STANDARD OF REVIEW
 
 10
 In this appeal, we decide whether the district court erred in holding that, as a matter of law, Bufman's claims and defenses are barred by D'Oench and 12 U.S.C. § 1823(e)(1). We review the grant of summary judgment de novo, applying the same standards used by the district court. Fed.R.Civ.P. 56(c). Summary judgment is appropriate if, after examining all the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains. Id.; Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir.1995). A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party. Id. at 594.
 
 III. DISCUSSION
 A. The D'Oench Doctrine
 
 11
 The D'Oench decision is the origin of the rule that, in a suit against the maker of a note by a federal deposit insurer, the maker is not allowed to raise a secret agreement between the maker and the payee bank as a defense. 315 U.S. 447, 62 S.Ct. 676. In D'Oench, the maker of the note had sold bonds to the bank, and the bonds had defaulted. Id. at 454, 62 S.Ct. at 678. So that the bank would not have to show the past due bonds among its assets, the note was executed to the bank with the secret understanding that it would not be called for payment. Id. The FDIC acquired the note as collateral for a loan to the bank, and sued the maker on the note. Id.
 
 
 12
 The issue that was the focus of the D'Oench litigation before it reached the Supreme Court was whether Missouri or Illinois law applied to determine whether the maker could assert the secret agreement as a defense. Id. The Court agreed with neither party, holding that federal law governed the liability of the maker on the note. The Court reached this conclusion because the FDIC brought suit under authority granted by the Federal Reserve Act, which evidenced a "federal policy to protect [the FDIC] and the public funds which it administers...." Id. at 457, 62 S.Ct. at 679. The Court held that, under federal law, the test for whether the maker could assert his defense was:
 
 
 13
 whether the note was designed to deceive the creditors or the public authority or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.
 
 
 14
 Id. at 460, 62 S.Ct. at 681. Under this test, the Court held that the maker's defense was barred. Id. at 461, 62 S.Ct. at 681.
 
 
 15
 The D'Oench doctrine was codified as a part of the Federal Deposit Insurance Act of 1950, codified as amended at 12 U.S.C. §§ 1811-35(a) (1994). The purposes of the statute and the common law rule are the same, and this court employs the same analysis under each. Resolution Trust Corp. v. Dunmar, 43 F.3d 587, 593 (11th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995). The Act provides that:
 
 
 16
 No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement--
 
 
 17
 (A) is in writing,
 
 
 18
 (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 
 
 19
 (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 
 
 20
 (D) has been, continuously, from the time of its execution, an official record of the depository institution.
 
 
 21
 12 U.S.C. § 1823(e)(1). The D'Oench doctrine has expanded dramatically in scope so that it now also applies in many factual situations that do not directly parallel the facts in D'Oench. Langley v. Federal Deposit Ins. Corp., 484 U.S. 86, 92, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987). The doctrine now applies to the FDIC as receiver as well as in its corporate capacity, and bars claims and defenses that are based on unrecorded agreements.[2] Adding to the breadth of the rule is the Supreme Court's interpretation of the word "agreement" in § 1823(e)(1) to include any unwritten or unrecorded condition to repayment, including the "truthfulness of a warranted fact." Langley, 484 U.S. at 92, 108 S.Ct. at 402. This court has stated the modern rule in plain terms as follows:
 
 
 22
 In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records.
 
 
 23
 Baumann v. Savers Federal Savings & Loan Assoc., 934 F.2d 1506, 1515 (11th Cir.1991), cert. denied, 504 U.S. 908, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992).
 
 
 24
 A host of failures of federally-insured depository institutions has prompted an increase in the number and variety of claims and defenses against which federal deposit insurers have asserted the bar of § 1823(e) and D'Oench. See Baumann, 934 F.2d at 1515. While the common law rule remains very broad, this court has recognized that some claims fall without the scope of its bar. For example, we have held that D'Oench does not bar free-standing tort claims that are unrelated to any asset of the depository institution. Vernon v. Resolution Trust Corp. ("Vernon I"), 907 F.2d 1101, 1108 (11th Cir.1990); Vernon v. Federal Deposit Ins. Corp. ("Vernon II"), 981 F.2d 1230, 1233-34 (11th Cir.1993).
 
 
 25
 Subsequent cases in this circuit make it clear that not all tort claims escape the D'Oench bar. Instead, the key inquiry is whether the tort claim is unrelated to a regular banking transaction. In re Geri Zahn, Inc., 25 F.3d 1539, 1543 (11th Cir.1994). While a "regular banking transaction" usually results in the acquisition of an asset, such as a note, by the insured depository, a regular banking transaction can also create a liability in the bank. See OPS Shopping Center, Inc. v. Federal Deposit Ins. Corp., 992 F.2d 306, 310 (11th Cir.1993) (holding that a letter of credit, which results in an obligation of the bank to a beneficiary, must satisfy the requirements of § 1823(e)(1)).
 
 
 26
 The Supreme Court explained the three policies animating § 1823(e)(1) in Langley, 484 U.S. at 91-92, 108 S.Ct. at 401-02, and the same policies are furthered by the common law D'Oench rule. First, § 1823(e)(1) ensures that federal and state examiners can rely on a bank's records when evaluating the bank's assets. Id. at 91, 108 S.Ct. at 401. The remaining two policies are reflected by the requirements that the "agreement" on which a claim or defense is based be executed and included in the bank's records at the same time that the related banking transaction is completed, and that the transaction be approved by the board or loan committee of the bank. 12 U.S.C. § 1823(e)(1)(B), (C), (D). "These ... requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Langley, 484 U.S. at 91, 108 S.Ct. at 401.
 
 
 27
 If D'Oench does not bar Bufman's claims, the claims may be asserted against the FDIC/Receiver, because, in accepting the appointment as receiver, the FDIC/Receiver assumes the liabilities of the failed institution. Vernon II, 981 F.2d at 1234 (citing 12 U.S.C. § 1821(d)(2)(A)(i) and (B)(i) (1994)). We will assume, without deciding, that state law applies to any claims in this case that are not barred by D'Oench.[3] We separately discuss each of Bufman's claims and defenses, addressing the D'Oench issue only where the claim or defense is not meritless as a matter of Florida law. See Gunter, 674 F.2d at 874 (refusing to decide whether securities fraud claims were D'Oench-barred because the claims were barred by federal securities law).
 
 B. Bufman's Claims
 1. State Securities Fraud
 
 28
 In his complaint, Bufman asserts two common law fraud claims and one Florida statutory securities fraud claim. All three claims allege that Bank M made material misrepresentations and omissions in connection with the sale of its stock to Zev Bufman. Bufman argues that his claims, like the securities fraud claims in the Vernon cases, are not barred by D'Oench because they are tort claims that are unrelated to a regular banking transaction. See Vernon I, 907 F.2d 1101; Vernon II, 981 F.2d 1230.
 
 
 29
 Bufman's argument fails because he assumes that securities fraud claims, as a category, are not barred by the D'Oench doctrine. In the Vernon cases, we held that the plaintiffs' securities fraud claims were not barred by D'Oench because the claims were not related to a regular banking transaction. Vernon I, 907 F.2d at 1107, Vernon II, 981 F.2d at 1233-34; OPS, 992 F.2d at 310 (discussing Vernon I and Vernon II ). But we have never held that securities fraud claims are, by their nature, unrelated to a regular banking transaction. To do so would invite litigants to recharacterize a defense to an obligation on an instrument acquired by the FDIC as a securities fraud claim. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 597 (11th Cir.), cert. denied sub nom., Jones v. Resolution Trust Corp., --- U.S. ----, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995).
 
 
 30
 In determining whether a particular claim is related to a regular banking transaction, we look not only to the type of claim, but to the allegations in the complaint and to the theory of recovery. Bufman's claims illustrate that a securities fraud claim may be related to a regular banking transaction: his claims are based in part on the allegation that Bank M misrepresented or failed to disclose that the $400,000 Bufman note was unsatisfied before closing on the private stock offering. (R. 1-1, Amended Complaint at 12, 14, 16.)[4] Unlike the claims in the Vernon cases, Bufman's securities fraud claims are related to a regular banking transaction: the Bufman note. Because they are related to a regular banking transaction, Bufman's securities fraud claims are barred by D'Oench, and summary judgment for the FDIC on these claims was not error.
 
 2. Failure to Give Notice of Dishonor
 
 31
 Two of Bufman's claims against the FDIC allege that Bank M failed to give Bufman timely notice after dishonoring the checks drawn on Masvidal's account. Both claims are grounded in Florida's commercial code governing bank deposits and collections, which Florida adopted from Article 4 of the Uniform Commercial Code ("UCC").[5] Bufman first claims that, as a collecting bank, Bank M had a duty to use ordinary care in sending notice of dishonor of the checks, and that the bank breached that duty by failing to send timely notice of dishonor. See Fla.Stat.Ann. § 674.202(1)(b) (1993) (requiring a collecting bank to use ordinary care in sending notice of dishonor); U.C.C. § 4-202 (1990). Because the bank was negligent, Bufman argues, it is liable for the amount of the checks under Florida law. See Fla.Stat.Ann. § 674.103(5) (1993); U.C.C. § 4-103(5) (1990). Second, Bufman claims that, as a depositary and payor bank, Bank M is accountable for the amount of the checks because the bank failed to pay the checks or give him notice of dishonor. See Fla.Stat.Ann. § 674.302(1)(a) (1993); U.C.C. § 4-302 (1990).
 
 
 32
 Bufman's first claim is meritless. Bank M did not owe a duty to use ordinary care in sending notice of dishonor under § 674.202 because this section only applies to collecting banks. With respect to these checks, Bank M was the depositary and payor bank, but it was not a collecting bank. See Fla.Stat.Ann. § 674.105 (defining payor bank, depositary bank, and collecting bank). Since Bufman's first check mishandling claim is meritless, we will not address his arguments that it survives the D'Oench bar. United States v. New York Tel. Co., 434 U.S. 159, 166, 98 S.Ct. 364, 369, 54 L.Ed.2d 376 (1977) (holding that a judgment may be affirmed on any ground supported by the law and the record that does not expand the relief granted).
 
 
 33
 Bufman's second claim for check mishandling is not facially meritless under Florida law. Section 674.302 states the responsibilities of a payor bank when it is presented with an item:
 
 
 34
 (1) If an item is presented to and received by a payor bank, the bank is accountable for the amount of:
 
 
 35
 (a) A demand item, ... whether properly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline ....[6]
 
 
 36
 Bufman alleges all of the elements of a claim under § 674.302: that he presented the checks to Bank M, that the checks were demand items, that Bank M was the payor and depositary bank with respect to these checks, and that the bank failed to pay the checks or return them or give notice of dishonor by the midnight deadline. Because Bufman's § 674.302 claim is not facially groundless, we will decide whether it is barred by D'Oench.
 
 
 37
 The FDIC contends that Bufman's claim for unlawful retention of the checks is barred by D'Oench because it is based on an agreement that does not satisfy the requirements of § 1823(e)(1) and is related to a regular banking transaction. The FDIC's argument is based on the fact that the checks were accompanied by a transmittal letter which instructed the bank to deposit the checks into Bufman's account, and to charge Bufman's account for the balance due on the Bufman note. The FDIC argues that the claim is based on an agreement, the transmittal letter, that was not included in the bank's records, and is related to the Bufman note. Bufman disagrees, contending that his § 674.302 claim is based on state law, and is unrelated to the transmittal letter. The fact that the transmittal letter accompanying the checks refers to the Bufman note is not relevant to Bufman's claim that the bank improperly retained the checks. As previously discussed, Bufman has alleged all of the elements of a claim for Bank M's failure, as the payor and depositary bank, to take timely action after presentment of the checks. In stating this claim, Bufman has not relied on the transmittal letter or its contents.
 
 
 38
 The FDIC's second argument that this claim is barred by D'Oench is that, by failing to obtain a receipt for his alleged deposit, Bufman lent himself to a scheme likely to mislead bank examiners. See D'Oench, 315 U.S. at 460, 62 S.Ct. at 681. But even if Bufman had taken this precaution, which is not a prerequisite to the bank's liability under § 674.302, the bank's record of the transaction would not necessarily satisfy the requirements of § 1823(e). In any case, this argument fails because Bufman's claim is not based on any agreement that is not part of the bank's records.
 
 
 39
 Bufman's § 674.302 claim is based on a routine agreement that is part of the bank's records: the contract of deposit that established his checking account with Bank M.[7] The terms of this contract are set by Florida law governing bank deposits, unless they are varied by agreement. See Fla.Stat.Ann. § 674.103(1).[8] One of the terms of this contract that is implied by Florida law is the obligation of the depositary bank, when it is also the payor bank, to take timely action following the presentment of a demand item. Fla.Stat.Ann. § 674.302. This rule encourages the acceptance of checks as a method of payment, because it assures that any insufficiency of the drawer's funds will be promptly communicated to the payee. WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, § 17-2 at 719 (3d ed. 1988). Because Bufman's § 674.302 claim is based on state law and an agreement that is in the bank's records, it is not barred by D'Oench.
 
 
 40
 The FDIC also argues on appeal that summary judgment was appropriate because Bufman failed to show presentment of the checks to Bank M. Under Florida law, presentment to an organization with the authority to pay or refuse is effective when it is received by any department of the organization. Capital City First National Bank v. Lewis State Bank, 341 So.2d 1025, 1034 (Fla.Dist.Ct.App.1977), cert. denied, 357 So.2d 186 (Fla.1978). The district court did not reach the issue of whether summary judgment was appropriate on the merits of Bufman's § 674.302 claim, and the court did not make any factual finding as to whether a valid presentment occurred. We prefer that the district court address this question in the first instance. See Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 806 (11th Cir.1991).
 
 3. Unjust Enrichment
 
 41
 In the amended complaint, Bufman alleges that because Bank M failed to notify him that the Bufman note was unsatisfied before closing on the stock offering, the bank was able to retain a $400,000 investment that was financed by Bufman, as well as the Bufman note. The bank, he argues, was unjustly enriched because it retained both the Bufman-financed investment and the note. Bufman contends that his unjust enrichment claim is not barred by D'Oench because it is not premised on the terms of the note or any other agreement, but on the bank's wrongful conduct.
 
 
 42
 Bufman's unjust enrichment claim is barred by D'Oench because it is premised on an unrecorded condition to the repayment of the Bufman note. Implicit in this claim is the allegation that the bank had an obligation to give Bufman notice that the note was unsatisfied before closing on the stock offering. If the bank agreed to give Bufman such notice, § 1823(e)(1)(D) requires the agreement to be included in the bank's records.[9] The FDIC has pointed to the absence of any such agreement in the records of the bank, and Bufman has provided no evidence to rebut that of the FDIC. Summary judgment for the FDIC on Bufman's unjust enrichment claim was not error.
 
 4. Civil Theft
 
 43
 The final count of the amended complaint alleges that Bank M willfully obtained property from Bufman with the intent to permanently deprive him of it, in violation of Florida's civil theft statute. The property which Bufman alleges was the subject of civil theft includes the $400,000 investment that was financed by Bufman, the $80,000 Bufman personally invested, and interest paid on the Bufman note. The district court held that Bufman's civil theft claim was related to the Bufman note and granted summary judgment for the FDIC/Receiver.
 
 
 44
 Florida law creates a civil cause of action for violations of certain criminal theft statutes that are proven by a preponderance of the evidence. Fla.Stat.Ann. § 772.11 (Supp.1995).[10] Several different actions may constitute theft under Florida's omnibus criminal theft statute, including, for example, theft by false pretenses and embezzlement. See State v. Lahurd, 632 So.2d 1101, 1103 (Fla.Dist.Ct.App.1994) (listing actions constituting theft under statute); Beal v. State, 620 So.2d 1015, 1016-17 (Fla.Dist.Ct.App.1993) (discussing elements of theft by false pretenses); Denson v. Stack, 997 F.2d 1356, 1362 (11th Cir.1993) (discussing elements of embezzlement under Florida law).
 
 
 45
 On its summary judgment motion, the FDIC/Receiver bears the burden of showing, by reference to the materials on file, that no genuine issue of material fact remains. Jeffery, 64 F.3d at 593. The determination of whether an issue of fact is material is made with reference to the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In arguing that no material issue of fact exists, the FDIC/Receiver makes no reference to the elements of theft by false pretenses, embezzlement, or any other action constituting theft under Florida law. Because we cannot discern the factual basis for the claim, we cannot determine whether D'Oench bars it. We hold that the FDIC has failed to meet its burden of showing that no genuine issue of material fact exists. This claim was not sufficiently "fleshed out" in the district court to support a grant of summary judgment for the FDIC/Receiver.
 
 
 46
 C. Bufman's Defense to the FDIC's Counterclaim on the Note
 
 
 47
 The district court held that Bufman's defenses to the FDIC/Corporate's suit on the note were barred by D'Oench. Bufman appeals the order granting summary judgment for the FDIC/Corporate on its counterclaim.
 
 
 48
 Bufman contends that summary judgment was inappropriate because, by the time the FDIC acquired the assets of Bank M, the Bufman note had been paid. Bufman's payment defense is closely related to his claim that the bank failed to give him timely notice after dishonoring the checks. According to Bufman, when Bank M failed to give him notice of dishonor by its midnight deadline, the bank became "accountable" for the amount of the checks under § 674.302. Bufman contends that the bank's accountability on the checks is equivalent to payment on the Bufman note. Bufman claims that the defense is not barred by D'Oench because his payment defense is not based on any side agreement, but rests instead on the proposition that the Bufman note was extinguished as a matter of state law.
 
 
 49
 This court has recognized that, in a suit by the FDIC involving an asset obtained from a failed bank, the requirements of § 1823(e)(1) do not apply to every inquiry concerning the asset. Federal Deposit Ins. Corp. v. Merchants Nat'l Bank of Mobile, 725 F.2d 634, 639 (11th Cir.), cert. denied, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). That § 1823(e)(1) does not apply to every conceivable defense is evident from the terms of the statute, which applies only to claims or defenses that are based on an agreement that does not meet the requirements of that section.
 
 
 50
 In Merchants National, we stated that § 1823(e)(1) does not apply to the defense that an asset is invalid due to events unrelated to any unrecorded side agreement, or to the defense that no asset existed for the FDIC to acquire. Id. Other courts have held that § 1823(e)(1) does not apply to the defense that the FDIC never acquired a note because all of the outstanding indebtedness evidenced by the note was satisfied before the FDIC acquired the assets of the failed bank. Federal Deposit Ins. Corp. v. Bracero & Rivera, Inc., 895 F.2d 824, 830 (1st Cir.1990); Commerce Federal Savings Bank v. Federal Deposit Ins. Corp., 872 F.2d 1240, 1246 (6th Cir.1989). Both the Bracero & Rivera and Commerce Federal courts found that the payment defenses in those cases were independent of any side agreement. 895 F.2d at 830, see 872 F.2d at 1246 (holding that deed of trust was extinguished as a matter of law).
 
 
 51
 Bufman's argument that the Bufman note was satisfied before the FDIC acquired it is flawed because, even if he can show on remand that the bank was accountable under Florida law for the value of the unreturned checks, this accountability did not extinguish his obligation on the Bufman note. Under § 674.302, a payor bank is accountable for the amount of a check, assuming the absence of a valid defense, if it does not pay, return, or give notice of dishonor of presented checks. Some authorities have equated accountability under U.C.C. § 4-302 with payment of the checks. See WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 17-3 at 732 (3d ed. 1988); Steven B. Dow and Nan S. Ellis, The Payor Bank's Right to Recover Mistaken Payments: Survival of Common Law Restitution Under Proposed Revisions to Uniform Commercial Codes Articles 3 and 4, 65 Ind.L.J. 779, 808 & n. 122 (1990) (listing cases that interpret "accountable" in U.C.C. § 4-302 as synonymous with "liable"). But Bufman cites no authority for the proposition that Bank M was required by law to apply the amount of the checks to Bufman's loan account. Because we hold that Bufman's payment defense is meritless under state law, we do not reach the question of whether it is barred by § 1823(e)(1). New York Telephone, 434 U.S. at 159, 98 S.Ct. at 364 (holding that a judgment may be affirmed on any ground supported by the law and the record that does not expand the relief granted).[11]
 
 
 52
 Because Bufman's defense to the FDIC's suit on the Bufman note lacks merit, summary judgment for the FDIC/Corporate was not error.
 
 IV. CONCLUSION
 
 53
 For the foregoing reasons, we affirm the grant of summary judgment for the FDIC/Receiver on all of Bufman's claims except his § 674.302 claim and his civil theft claim. We hold that the § 674.302 claim against the FDIC/Receiver is not barred by D'Oench, and that the FDIC failed to meet its burden on its motion for summary judgment on the civil theft claim. We vacate the grant of summary judgment on these two claims, and remand to the district court for further proceedings. The district court's grant of summary judgment for the FDIC/Corporate is affirmed, because Bufman's defense to the claim on the note is meritless.
 
 
 54
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 
 
 *
 Honorable Gerard L. Goettel, Senior U.S. District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The Zev Bufman Sports, Entertainment, and Facility Development Corporation later assumed liability on the note. We will refer to the plaintiffs, Zev Bufman, Vilma Bufman, the Bufman Organization, and the Zev Bufman Sports Entertainment, and Facility Development Corporation, collectively as "Bufman." We will refer to the plaintiffs individually, where necessary, by their full names
 
 
 [2]
 Section 217(4) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, amended § 1823(e) to apply to the FDIC as receiver. FIRREA also amended the Federal Deposit Insurance Act to bar claims against the FDIC based on agreements that do not satisfy the requirements of § 1823(e)(1). 12 U.S.C. § 1821(d)(9)(A)
 
 
 [3]
 Bufman cites Florida law to support his claims and defenses, and the FDIC does not contest the application of Florida law to any claims or defenses that survive D'Oench. We assume, without deciding, that Florida law applies to any of Bufman's claims and defenses that are not barred by D'Oench
 
 
 [4]
 Bufman argues that if he had known before the closing that the Bufman note was not paid, he would also have surmised that Masvidal had not obtained other financing for his purchase of Bank M stock. Bufman claims that if he had known that he was financing Masvidal's purchase of Bank M stock, he would not have purchased additional stock in his own name
 
 
 [5]
 Effective January 1, 1993, the Florida legislature adopted the 1990 revision of U.C.C. Article 4. See generally §§ 674.101-674.504 (1993 & Supp.1995). Although the events relevant to Bufman's claim occurred before Florida's adoption of the revision, the amendments do not affect our resolution of the issue of whether Bufman's Article 4 claims are D'Oench-barred. All cites are to the current official Florida code
 
 
 [6]
 "Presentment" is a demand to pay or enforce the instrument made by or on behalf of a person entitled to enforce it, and it is effective "when the demand for payment or acceptance is received by the person to whom presentment is made...." Fla.Stat.Ann. § 673.5011 (1993). The bank's "midnight deadline" is "midnight on its next banking day following the banking day on which it receives the relevant item...." Fla.Stat.Ann. § 674.104(j) (1993)
 The basic rules regarding the payor bank's liability remain the same under revised U.C.C. § 4-302 as they were under the former text. Henry J. Bailey, New 1990 Uniform Commercial Code: Article 3, Negotiable Instruments and Article 4, Bank Deposits and Collections, 29 Willamette L.Rev. 409, 550 (1993) (stating that the basic rules regarding the payor bank's liability are probably unchanged by revised § 4-302). However, the 1990 revision more clearly states what constitutes a valid defense for the bank under this section. JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 17-3 at 113-14 (3d ed. Supp.1993) (discussing what defenses are available to the bank under revised § 4-302).
 
 
 [7]
 The foundation of a demand deposit, or checking account, is the contract of deposit between the bank and the customer. See Edgerly v. Schuyler, 113 So.2d 737, 742 (Fla.Dist.Ct.App.1959), aff'd sub nom., Miami Beach First Nat'l Bank v. Edgerly, 121 So.2d 417 (Fla.1960)
 
 
 [8]
 The parties do not argue, and nothing in the records suggests, that the terms of Bufman's contract of deposit were varied by agreement
 
 
 [9]
 Bufman does not argue that the bank was required by law to give him notice
 
 
 [10]
 Damages under § 772.11 may be trebled if there is no contractual relationship between the parties. Leisure Founders, Inc. v. CUC Inter., Inc., 833 F.Supp. 1562, 1573 (S.D.Fla.1993). Bufman requested treble damages in the amended complaint, but the district court dismissed the claim for treble damages against the FDIC/Receiver. (R. 1-27.) Bufman does not appeal this order
 
 
 [11]
 Bufman also points to a clause in the note stating that it is governed by Florida law, and reiterates his payment defense that is based on Florida law. This "breach of bilateral obligations defense" is not discrete, and we find it spurious